HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation organized and existing under the Laws of the State of Connecticut,

*vs.*

W. S. DICKEY CLAY MANUFACTURING COMPANY, a corporation organized and existing under the Laws of the State of Delaware.

*New Castle, July 9, 1941.*

18

*Stewart Lynch,* for complainant.

*William S. Potter,* of Southerland, Berl, Potter & Leahy, for defendant.

THE CHANCELLOR: This case involves an alleged violation of the contract rights of the owners of the common stock of the W. S. Dickey Clay Manufacturing Company, and is before this court on a demurrer to an injunction bill filed by the Hartford Accident and Indemnity Company. The latter company .is the owner of a considerable block of that class of defendant's capital stock, and alleges that a purported amendment to its certificate of incorporation, acted on at a stockholders' meeting held January 10th, 1940, did not receive the requisite vote, and is null and void, at least as to non-assenting common stockholders. The complainant, therefore, seeks to prevent the defendant from filing a certified copy of the purported amendment in the office of the Secretary of State, and the demurrer squarely raises the question as to its validity.

Prior to January 10th, 1940, and since October, 1937, the defendant's authorized capital stock had consisted of 260,000 shares of no par value preferred stock, 500,000 shares of $1.00 par value Class A stock, and 195,000 shares of no par value common stock. The preferred stock was entitled to a non-cumulative dividend of $1.00 a year out of the net profits, and was subject to redemption at $17.50 a share, plus any declared and unpaid dividends thereon; and on liquidation was entitled to $15.00 a share. The 500,000 shares of $1.00 par value Class A stock were entitled to a six per cent cumulative dividend, and were redeemable at par, plus all accrued and unpaid dividends thereon; and on liquidation of the corporation, were entitled to par value plus accrued dividends. This stock was subject, however, to the prior rights of the preferred stock. The common stock was to receive no dividends until the preferred stock had received $1.00 per share for two consecutive years, and until the Class A stock had been retired. The adoption of the purported amendment in controversy had been previously recommended by the directors of the defendant company by a resolution adopted by them November 17th, 1939, and

the defendant company claims that said amendment was affirmatively acted on by the proper vote at the stockholders' meeting held on January 10th, 1940. If valid, it will increase the authorized Class A stock from 500,000 shares to 1,000,-000 shares; but no other changes will be made in the capital structure of the corporation, or in the existing charter rights of the various classes of stock.

On January 10th, 1940, the defendant company had previously issued and there were then outstanding 211,775 shares of preferred stock, 422,995 shares of Class A stock, and 51,806 shares of common stock. Of these issues, the complainant held and owned twenty-five (25) shares of preferred stock, 20 shares of Class A stock and 35,890 shares of common stock, or approximately sixty-nine per cent of the latter issue. An agent of the complainant company attended that meeting and demanded that the common stock be voted separately on the proposed charter amendment. The chairman ruled, however, that the vote should be taken by the Class A stockholders, voting as one class, and by the preferred and common stockholders, voting together, and the vote was taken accordingly. The result was that 352,-261½ shares of Class A stock were voted for the amendment, and the 20 shares of that issue, owned by the complainant, were voted against it.

The bill also alleges and the demurrer admits that 183,-325 shares of the common and preferred stock, voted together, were cast for the amendment, and 36,415 shares of those stock issues were voted against it. It also appears however that that amendment did not receive a majority vote of the common stock then outstanding.

It is conceded that under the laws of this State a corporate charter may be amended, increasing an authorized capital stock issue, by the appropriate vote of the stockholders. § 83, *Gen. Corp. Law*, (§ 2115, *Rev. Code* 1935) ; *Morris v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696; *Davis v. Louisville Gas & Electric Co.*, 16 *Del. Ch.* 157, 142

*A.* 654; *Keller v. Wilson & Co.,* 21 *Del. Ch.* 391, 190 *A.* 115; *Shanik v. White Sewing Machine Co.,* 25 *Del. Ch.* 154, 15 *A.* 2d 169, *affirmed,* 25 *Del. Ch.* 371, 19 *A.* 2d 831. But whether the alleged amendment in question is valid necessarily depends on the proper construction of the defendant's charter, including all pertinent provisions of the General Corporation Law which are impliedly written into that contract. § 83, *Gen. Corp. Law,* (§ 2115, *Rev. Code* 1935) ; *Peters v. United States Mortg. Co.,* 13 *Del. Ch.* 11, 114 *A.* 598; *Morris v. American Public Utilities Co., supra; Davis v. Louisville Gas & Electric Co., supra; Keller v. Wilson & Co., supra; Shanik v. White Sewing Machine Co., supra.*

*Section* 17 of that *General Law,* § 2049, *Rev. Code* 1935, provides:

"Unless otherwise provided in the Certificate of Incorporation, each stockholder, shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock held by such stockholder * * *".

Pursuant to the provisions of that section, the defendant's certificate of incorporation provides:

"At all meetings of the stockholders of the corporation, each holder of preferred and common stock shall be entitled to one vote for each share of stock outstanding in his or her name on the books of the corporation, whether it be preferred or common stock, or both."

Independent of any other pertinent provisions of the General Corporation Law, voting rights in the defendant company are, therefore, wholly vested in its outstanding preferred and common stock. But it is conceded that the language of *Section* 26, § 2058, *Rev. Code* 1935, is the important charter provision to consider. It authorizes certain specified amendments to a corporate charter affecting, among other things, stock issues, including "reclassifying the same * * * by increasing or decreasing its authorized capital stock or reclassifying the same, by changing the number, par value, designations, preferences, or relative,

participating, optional or other special rights of the shares, or the qualifications, limitations or restrictions of such rights."

It also prescribes the necessary vote to amend, and in that connection provides:

"At said meeting [stockholders' meeting] a vote of the stockholders so entitled to vote, * * * shall be taken for and against the proposed amendment * * *. Said Judges [appointed to conduct the vote] shall * * * count and ascertain the number of shares voted respectively for and against the amendment, and shall declare whether the persons or bodies corporate holding the majority of the voting stock of said corporation (or of each class of stock entitled to vote thereon, when such vote is to be taken by classes) have voted for or against the proposed amendment; and shall make out a certificate accordingly * * *. If it shall appear by said Certificate of Judges that the persons or bodies corporate holding the majority of the stock of said corporation entitled to vote (or of each class of stock when such vote is to be taken by classes) have voted in favor of the amendment, a certificate setting forth the amendment and certifying that such amendment has been duly adopted in accordance with the provisions of this Section shall be made * * * and signed by its President * * *," and filed in the office of the Secretary of State.

## But the same section also provides:

"* * * And upon so filing and recording the same, the Certificate of Incorporation of said corporation shall be deemed to be amended accordingly; provided, however, that if any such proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock, by the Certificate of Incorporation, so as to affect such class or classes of stock adversely, or would increase or decrease the amount of the authorized stock of such class or classes of stock, or would increase or decrease the par value thereof, then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not."

## It further provides:

"* * * and the affirmative vote of a majority in interest of each such class of stock so affected by the amendment shall be necessary to the adoption thereof, in addition to

the affirmative vote of a majority of all other stock entitled to vote thereon; * * *."

Transposing and inserting language that is omitted for the sake of brevity, but necessarily implied, the first three phrases of the proviso of *Section* 26 must be read as follows:

(1) "* * * if any such proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock, by the Certificate of Incorporation, so as to affect such class or classes of stock adversely * * * then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not * * *.

(2) "Or [if any such proposed amendment] would increase or decrease the amount of the authorized stock of such class or classes of stock, * * * then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not * * *,

(3) "Or [if any such proposed amendment] would increase or decrease the par value thereof, then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not; * * *."

When so read, the real intended scope of the second phrase of the proviso of *Section* 26 seems clear. All of the amendments enumerated in that part of the section require (1) the affirmative vote of a majority of any class of stock "so affected" thereby, and (2) the affirmative vote of a majority of all other stock entitled to vote thereon. The words "so affected" are applicable to each of the three material phrases in question, but it is apparent that they do not have the same meaning in each case. When applied to the first phrase, they seemingly refer to amendments which alter or change the "preferences, special rights or powers" given to any class or classes of stock by the certificate of incorporation "so as to affect" that stock "adversely" in any of these respects. See *Morris v. American Public Utilities Co., supra; Shanik v. White Sewing Machine Co.,*

*supra; Sellers vs. Joseph Bancroft & Sons Co.,* 25 *Del.* Ch. 268, 17 *A.* 2*d* 831. But the more specific provisions of the second phrase necessarily control this case; and when the words "so affected by the amendment" are applied to that phrase, it is apparent that they merely refer to an increase or decrease of an authorized class of stock, and are in no sense defined or explained by the general language of the preceding phrase.

The bill alleges and the demurrer admits that the amendment of January 10th, 1940, received a majority vote of the Class A stock, and also a majority vote of the ordinary voting stock of the corporation, consisting of the preferred and common stock, voting together as one class. The question involved is clearly one of contract rights, and under a fair and reasonable construction of the defendant's charter, including the provisions of *Section* 26, it seems difficult to escape the conclusion that that vote was sufficient and that the affirmative vote of a majority of the common stock, voting as a separate class, was not required. Conceding, therefore, that the relative position of the common stock in the financial setup of the corporation will be materially changed to its disadvantage by the issuance and sale of additional Class A stock, in view of the specific provisions of the second phrase of the proviso of *Section* 26 that fact is of no real importance in determining this phase of the case. See *Morris v. American Public Utilities Co.,* (1923) 14 *Del. Ch.* 136, 122 *A.* 696; *Shanik v. White Sewing Machine Co.,* 25 *Del. Ch.* 154, 15 *A.* 2*d* 169, *affirmed,* 25 *Del. Ch.* 371, 19 *A.* 2*d* 831. Moreover the history of that section seems to corroborate this conclusion. It was enacted in its present form in 1931 by *Chapter* 129, *Volume* 37, *Laws of Delaware.*

The first provision, requiring class voting of any stock issues, was inserted in 1917 by *Section* 12, *Chapter* 113, *of Volume* 29, *Laws of Delaware.* *Section* 26 then provided:

"* * * if any such proposed amendment would alter or change the preferences given by any one or more classes of preferred stock, au-

thorized by the certificate of incorporation, or would increase or de-
crease the amount of the authorized stock of such class or classes of
preferred stock, or would increase or decrease the par value thereof,
then the holders of the stock of each class of preferred stock so af-
fected by the amendment shall be entitled to vote as a class upon such
amendment, whether by the terms of the certificate of incorporation
such class be entitled to vote or not; * * *."

In 1927 the proviso of the same section was amended
by *Section* 10, *Chapter* 85, *Volume* 35, *Laws of Delaware*, so
as to read:

"* * * provided, however, that if any such proposed amendment
would alter or change the preferences given to any one or two more
classes of stock, by the certificate of incorporation, or any amendment
thereto, or by the resolution or resolutions providing for the issue of
any such stock adopted by the Board of Directors as in this Chapter
provided, so as to affect such class or classes of stock adversely, or
would increase or decrease the amount of the authorized stock of such
class or classes of stock, or would increase or decrease the par value
thereof, then the holders of the stock of each class of stock so affected
by the amendment shall be entitled to vote as a class upon such amend-
ment, * * *."

That amendment made two material changes in the
prior provisions of the section. It eliminated the limiting
word "preferred" wherever it appeared, and, therefore,
materially broadened the scope of the section in some re-
spects. It also inserted the words "so as to affect such class
or classes of stock adversely" in the first phrase. But the
words "so affected by the amendment" in the general pro-
vision, applicable to each phrase, has appeared in the section
since its original enactment in 1917. As I have already
pointed out, other changes in the section were made in 1931,
but I find nothing to indicate that the provisions of the first
phrase were intended to define or explain the meaning of
the second and third phrases, as is contended by the com-
plainant.

The amended bill also alleges, however, that it appeared
from the defendant's letter of December 11th, 1939, ac-
companying the notice of the stockholders' meeting of Jan-

uary 10th, 1940, that the corporation was "not in any financial difficulties"; that it likewise appeared therefrom that the proposed increase of the Class A stock issue from 500,000 to 1,000,000 shares was "not for the purpose of borrowing money or for other corporate purposes," but the "authorization of * * * additional Class A stock" would "benefit only the holders of the preferred stock and Class A stock of the respondent corporation." A copy of that letter is attached to the complainant's bill.

The complainant claims, therefore, that regardless of the strict contract rights of the holders of the common stock of the corporation, it appears that the amendment of January 10th, 1940, is wholly unfair to them, and its enforcement should be enjoined by this court on the application of a non-assenting stockholder of that class. There is no specific prayer in the bill for relief on the ground of unfairness, but there is a prayer for general relief, on which the complainant relies. 1 *Daniell's Chancery Pl. & Pr.*, (*Perkins Ed.*) 442, *note*. The defendant company not only denies that any unfairness to the common stockholders appears, but also contends that the allegations of the bill, with respect to that claim, were too general and indefinite to comply with the rules of good pleading, and should, therefore, be disregarded. But it did not demur specially on that ground, and the allegations with respect to unfairness must, therefore, be considered.

The W. S. Dickey Clay Manufacturing Company was reorganized in 1934 under *Section 77B* of the *Federal Bankruptcy Act*, 11 *U.S.C.A.* § 207, and the preferred stock is largely held by persons who were originally creditors of the corporation. At the time of its reorganization, a trust indenture providing for a sinking fund, to secure the payment of principal and interest on certain outstanding notes, was executed by that corporation. These notes have not yet been fully paid. In that instrument, the Dickey Clay Company, among other things, covenanted and agreed that it would

not declare or pay any dividends on any of its stock in any calendar year until it should have deposited $75,000 with the trustees therein named, plus an amount equal to the sum proposed to be distributed as a dividend on any shares of stock. Prior to January 10th, 1940, the charter of that corporation provided:

"If in any year the corporation shall have sufficient earnings to pay a dividend upon the outstanding preferred stock of the corporation, and if a dividend thereon shall be declared by the Board of Directors, and such dividend shall not be declared payable in cash, either wholly or in part, then any difference between the amount declared payable in cash and a dividend of One ($1.00) Dollar per share upon the outstanding preferred stock shall be declared and paid in Class A stock of the corporation, to be issued at par."

For some reason, the same provision appears in the charter amendment of January 10th, 1940.

The defendant's letter of December 11th, 1939, contained a financial statement, shown by an audit of its affairs. That statement showed a net profit for the fiscal year, ending October 31st, 1939, of $605,000, though the figures for the last month were merely estimated. It also showed an accumulated surplus of $388,144.80, but it did not appear how much of that was in cash. It did appear, however, that if a dividend of $1.00 per share, payable wholly in cash, should be declared and paid on the preferred stock, and other fixed charges be added thereto, that $662,289.59 would have been required. The letter also pointed out:

(1) "That under Article IV. of the Charter, the dividends on preferred stock are non-cumulative. That is to say if they are not paid one year they cannot be carried forward and added to the dividend payable a succeeding year. * * * The Charter requires that such dividend must be in the amount of One ($1.00) Dollar per share and no more or less * * *.

(2) "It is manifest (from figures given) that the company's financial position at the end of October 31st, 1939 did not admit of a declaration of One ($1.00) Dollar cash dividend on the preferred stock, having due regard to the protection of the company and the best interest of the stockholders * * *.

(3) "While no one can safely predict the future for a year, present indications are that the directors at the end of the fiscal year 1940 may be able to increase the cash payment on the One ($1.00) Dollar dividend to the preferred stockholders over the cash payment in 1939, but it will still be necessary to use Class A stock to make up the difference between whatever cash can be devoted to that purpose and the fixed requirement of One ($1.00) Dollar.

(4) "Another feature which confronts the management and directors is the requirement in the Class A stock that a six percent (6%) dividend therein specified must be paid cumulatively. That is to say, if not paid one year it must be paid in a succeeding year, in addition to the current obligation; and furthermore in case of default of such dividend payment to the Class A stockholders, the holders of that Class A stock are given full voting rights * * *.

(5) "On the other hand, the fixed obligation of six percent (6%) on the Class A stock is not unduly burdensome, and the company can well discharge it with the resulting advantage which it gives of maintaining the position of the preferred stockholders and the financial stability of the enterprize.

(6) "We are advised by counsel that the company will not be permitted to pay any dividends on Class A shares until and unless the dividend requirement of One ($1.00) Dollar per share on the preferred stock has first been satisfied.

(7) "It is to the advantage of stockholders that the company continue a program of improvement and expansion, and devote so much of its cash earnings, as may be needed, to that purpose.

(8) "It is to the interest of the preferred and Class A stockholders, therefore, to vote for the proposed increase of Class A stock * * *. There are now in the treasury of the company unappropriated, and which may be hereafter available, only 77,005 shares of this class, manifestly, from the figures which we have advanced, too narrow a margin for safety in securing the position of the preferred and Class A stockholders in this corporation.

(9) "For the reasons already pointed out, in any forecast of the future over the next two or three years, it is apparent that the preferred stockholders will have to rely upon obtaining a part of their dividends from Class A shares. If the company has not the Class A shares in its treasury available for that purpose, then the preferred stockholders will receive no dividends for that year. Neither can the Class A stockholders receive a dividend. The increase of Class A stock therefore becomes a bulwark of safety to be prudently and economically exercised by the directors, only to the extent necessary for the pur-

pose of meeting the dividend requirements (1) from as much cash as the company can devote to that purpose, (2) supplying the balance of the required amount with Class A shares."

(10) That in 1939 only 20c of the dividend on the preferred and Class A stock was paid in cash, while the remaining 80c was paid in Class A 6% stock. Though the cash payment was slightly different, a somewhat similar policy was adopted in 1937 and 1938.

The concluding paragraph of the letter of December 11th, 1939, is as follows:

(11) "It is to the advantage of all stockholders that the company continue a program of improvement and expansion and devote so much of its cash earnings, as may be needed, to that purpose. Therefore, the resolution to increase the Class A stock to 1,000,000 shares from 500,000 shares is for the best interest of all shareholders, including the common shareholders."

In the absence of fraud, either express or implied, the action of the governing body of a corporation, in matters of internal management of this nature, will not be disturbed by a court of equity. *Mercantile Trading Co. v. Rosenbaum Grain Corp.*, 17 *Del. Ch.* 325, 154 *A.* 457; *Bodell v. General Gas & Electric Co.*, 15 *Del. Ch.* 420, 140 *A.* 264; *Cole v. National Cash-Credit Asso.*, 18 *Del. Ch.* 47, 156 *A.* 183; *Davis v. Louisville Gas & Electric Co.*, 16 *Del. Ch.* 157, 142 *A.* 654; 13 *Fletcher Cyc. Corp.*, (*Per. Ed.*) § 5821. Moreover, there is always a presumption in such cases that the action taken was in good faith. *Cole v. National Cash-Credit Assn., supra; Davis v. Louisville Gas & Electric Co., supra;* 13 *Fletcher Cyc. Corp.*, (*Per. Ed.*) § 5821, *note*. But the defendant necessarily concedes that the right of the controlling stockholders to amend in cases of this nature, though pursuant to charter authority, must be exercised with fair and impartial regard for the rights and interests of all of the corporate stockholders of every class; and not for the sole benefit of particular classes, to the clear prejudice of other outstanding issues. *Allied Chemical & Dye Co. v. Steel & Tube Co.*, 14 *Del. Ch.* 1, 120 *A.* 486. Any other action would be a breach of the fiduciary relation occupied by the majority

stockholders toward the minority, and would constitute fraud. *Id.*

In determining whether the bill alleges any such unfairness, we must bear in mind that when considering the real meaning of the language used every reasonable inference is against the pleader. We must also bear in mind that the complainant merely seeks to prevent the defendant corporation from carrying into effect the amendment of January 10th, 1940. No other unfair action is alleged to be imminent, and no other remedy is sought by injunctive process.

The bill alleges that it appears from the letter of December 11th, 1939, that the corporation was "in no financial difficulties" and the increase in the Class A stock issue was not for any corporate purpose but would "benefit only the holders of the preferred and Class A stock * * *." The complainant claims that when these allegations are read in connection with the facts stated in that letter, fraud on the part of the majority of the voting stockholders is necessarily implied; but I am unable to agree with that contention. The letter in question was written by the directors to the stockholders, advising the latter to vote for the charter amendment, to be presented at the meeting of January 10th, 1940. Among other reasons, they stated that the financial position of the corporation did not justify the payment of dividends on the preferred and Class A stock wholly in cash, but that, in their opinion, it would be practicable to declare a dividend for the year 1940, and perhaps thereafter, payable partly in cash and partly in Class A stock. It also appeared that such had been the dividend policy of the corporation for several years. They likewise pointed out that, if dividends were not paid on the preferred and Class A stock, the existing voting rights would be materially changed.

Should the charter amendment be carried into effect, and the new Class A stock be issued, that letter might perhaps be some indication of the probable attitude of the directors, with respect to the use of that stock for dividend

purposes. But we are considering questions of pleading and not proof, and no threatened acts on their part are either directly or indirectly charged. True, the amendment of January 10th, 1940, provides "if a dividend shall be declared" on the preferred stock "payable in cash either wholly or in part" that "any difference between the amount declared payable in cash and One ($1.00) Dollar per share * * * shall be declared and paid in Class A stock." While, therefore, the issuance of additional Class A stock is authorized by the amendment, it does not necessarily follow from the allegations of the bill that it will merely be used to pay dividends on a particular class of stock, even though that would be unfair to the common stockholders.

The bill also alleges that *Section* 26 of the *General Corporation Law* violates the contract and due process clauses of the *Federal Constitution, Article* 1, § 10, *Amend.* 14; but, as the complainant's rights are wholly of a contractual nature, there seems to be no basis for that contention. *Davis v. Louisville Gas & Electric Co., supra; Peters v. United States Mortgage Co., supra; Hinckley v. Schwarzschild, etc.,* 107 *App. Div.* 470, 95 *N.Y.S.* 357.

The defendant's demurrer to the complainant's bill will be sustained.

An order will be entered in accordance with this opinion.

Note. An order sustaining the demurrer was entered in accordance with the foregoing opinion, and the complainant thereafter elected that a final decree dismissing the bill of complaint be entered, from which an appeal was taken. For opinion of the Supreme Court affirming said decree, see *post* p. 16, 24 A. 2d 315.