BAY NEWFOUNDLAND COMPANY, LIMITED, a Corporation created by and existing under the Laws of Newfoundland,

*vs.*

WILSON & CO., INC., a Corporation created by and existing under the Laws of the State of Delaware.

*New Castle, August 17, 1942.*

*Josiah Marvel, Jr.,* of the firm of Marvel & Morford, (Henry B. Hodge, of New York City, of counsel), for complainant.

*Edwin D. Steel, Jr.,* of the office of Hugh M. Morris, for defendant.

THE CHANCELLOR: On February 19th, 1938, Bay Newfoundland Company, Limited, the complainant, the equitable owner of 1700 shares of Class A stock of Wilson & Co., Inc., filed a bill, challenging the validity, as against a non-assenting stockholder, of a plan of recapitalization of the defendant company. That plan had become effective on February 23rd, 1935, pursuant to a charter amendment approved by a large majority of the stockholders on February 19th, 1935.

Prior to the adoption of the amendment and the recapitalization plan objected to, Wilson & Co., the defendant, had three classes of stock outstanding: a 7% cumulative preferred stock, a Class A stock and a common stock issue. The preferred stock was entitled, annually, to the payment of dividends of $7.00 per share prior to the payment of dividends on either the Class A or common stock. At the time of the adoption of the recapitalization plan, the accrued and unpaid dividends on that stock amounted to $26.25 per share, or to the aggregate sum of $5,965,260.00. On liquidation, the 7% preferred stock had preferential rights over both the Class A and common stock. The Class A stock was entitled to dividends in the amount of $5.00 per share annually prior to the payment of any dividends on the common stock, and had cumulative dividend rights from and after November 1st, 1930. These rights were, however, junior to those of the 7% preferred stock. At the time of the adoption of the plan, the accrued and unpaid dividends on the Class A stock amounted to $21.25 per share, or, in the aggregate, to the sum of $6,656,264.00. On liquidation, the Class A stock was entitled to $75.00 per share, and "in addition thereto an amount which, together with the aggregate of the dividends paid upon such shares during the period following October 31st, 1930, will be equal to Five Dollars ($5.00) per share per annum from the date of cumulation of such stock to the date of distribution upon

such liquidation or dissolution or winding up." Its rights were senior to those of the common stock, but were junior to those of the 7% preferred stock. The Class A stock was also redeemable at $75.00 per share, plus all accrued and unpaid dividends thereon. Each share of the three classes of stock had equal voting rights. No dividends had ever been paid on either the Class A stock or the common stock. By the terms of the plan of recapitalization, in controversy, each share of the 7% cumulative preferred stock, together with the accrued dividends thereon, was reclassified into 1.4292 shares of the new 6% preferred stock. Each share of the Class A stock, together with the dividends accumulated thereon, was reclassified into five (5) shares of common stock, and thereafter no Class A stock was provided for in the defendant's charter. Each share of the old common stock was also reclassified into one share of new common stock. At the time of the recapitalization of Wilson & Co., Inc., that corporation and its subsidiaries had an earned and undistributed surplus of $8,214,322.14. The 1700 shares of Class A stock, of which the complainant was the equitable owner, stood on the books of the defendant corporation in the name of A. M. Kidder & Co., a Chicago brokerage house, and the accrued and unpaid dividends thereon amounted to $36,125.00, to the payment of which a substantial portion of the corporate surplus was fairly applicable. The charter amendment and recapitalization plan, attacked by the complainant, were approved by the directors of Wilson & Co., Inc., on December 14th, 1934, and a resolution to submit them to the stockholders at a meeting to be held on February 19th, 1935, was adopted. The substance of the recapitalization plan appeared in the New York evening papers on December 14th, 1934, and in the morning papers of the following day, including the Wall Street Journal; but it does not clearly appear that it was seen by any of the officers of the complainant company on those dates. Penick, the customers-man at A. M. Kidder

& Co., and under whose advice the complainant's stock had been purchased, undoubtedly saw the references to the plan in these papers; but the complainant's records show that he did not become an officer of that company until February 26th, 1936. Other evidence indicates that he was elected on a much earlier date, but the corporate records would seem to be more trustworthy. Nor does it clearly appear when Penick first discussed the plan with any officer of Bay Newfoundland Company. On January 2nd, 1935, Wilson & Co. sent notices to its stockholders of record of the proposed meeting to be held on February 19th, 1935. They were accompanied by a letter from the chairman of the board, explaining in detail and contemplated charter amendment and recapitalization plan. These papers were sent to A. M. Kidder & Co., the record and apparent owner, but Bay Newfoundland Company admits having seen them shortly after they were sent out. Both on January 23rd and February 5th, 1935, the record stockholders of the defendant company were again notified by letter that the proposed plan would be submitted to them at the meeting of February 19th. In one of these letters, voting proxies were sought; in the other, the holders of stock were requested to examine the plan, and, if they deemed it to their interests, to vote for it. It is admitted that these letters were likewise seen by the complainant shortly after they had been mailed. At the meeting held on February 19th, 1935, the stockholders of the defendant company voted overwhelmingly in favor of the adoption of the charter amendment and the recapitalization plan, and the amendment was filed in the office of the Secretary of State on February 23rd, 1935. Penick studied the proposed plan and told some of the officers of Bay Newfoundland Company that he deemed it unfair to Class A stockholders of Wilson & Co. It does not appear just when this conversation took place, but the fair inference is that it was before the stockholders' meeting of February 19th. No representative of Bay Newfoundland Company attended

that meeting, nor did it cause any of its stock to be voted by proxy against the proposed charter amendment and re-capitalization plan. Furthermore, it did not advise Wilson & Co., at any time prior to February 23rd, that it deemed the contemplated plan either unfair or illegal. The letter from the chairman of the board of Wilson & Co. to its stockholders, which was seen by the complainant company early in January of 1935, among other things, stated: "Application will be made promptly to register the $6.00 preferred stock and the additional shares of common stock on the New York Stock Exchange." Perhaps that might have been expected, as the old stock had been listed on that exchange. At any rate, on February 25th, 1935 the new $6.00 preferred stock was listed on that exchange. The old common stock continued to be traded in on the same exchange after the plan had become effective, and after additional shares had been issued. Between February 25th, 1935 and February 19th, 1938, when the bill was filed, 271,000 shares of the $6.00 preferred stock of Wilson & Co., and 4,570,000 shares of its common stock had been bought and sold on the New York Stock Exchange. On January 15th, 1938, there were of record 11,601 stockholders of that company, who were not stockholders of record on February 19th, 1935. Between February 19th, 1935, and February 19th, 1938, 226,488 shares of the 227,233 shares of 7% preferred stock outstanding prior to the adoption of the plan had been exchanged pursuant to its terms. Of the 313,205 shares of the Class A stock, outstanding prior to the adoption of the plan, 309,-001 shares thereof had been exchanged prior to February 19th, 1938. In all, therefore, 99.67% of the 7% preferred stock and 98.66% of the Class A stock had been exchanged under the plan when this bill was filed. In the letter from the chairman of the board to the stockholders of Wilson & Co., dated January 2nd, 1935, which was seen by the complainant company about the time it was sent out, the hope was expressed that dividend payments on the common stock

could be "inaugurated in the early part of 1935." On February 26th, 1935, three days after the certificate of amendment had been filed in the proper office, the board of directors of the defendant company, therefore, declared a dividend of $1.50 per share, payable May 1st, 1935, on the new $6.00 preferred stock and a dividend of 12½c per share, payable June 1st, 1935, on the common stock. These dividends amounted to approximately $700,000. A check, for the amount to which the complainant's 1700 A shares would have been entitled had they been exchanged under the plan for common stock, was sent to Kidder & Company, the record owner, and was forwarded by it to the complainant, but was promptly returned. Between February 23rd, 1935, and February 19th, 1938, twelve dividends had been declared and paid on the new $6.00 preferred stock of the defendant company, aggregating $5,816,014.00, and eleven dividends had been paid on its common stock, aggregating $2,748,929.-66; but none of these dividend checks was accepted by the complainant. On March 1st, 1935, Bay Newfoundland Company consulted Mr. Hodge, its counsel, with respect to the validity of the amendment to the defendant's charter, and on March 5th, 1935, he wrote to Wilson & Co., stating that the plan of recapitalization and the amendment in connection therewith were unfair and illegal, and that he had been instructed to institute legal proceedings. The receipt of this letter was acknowledged by the defendant, and on March 16th, 1935, there was a conference between Hodge and a vice-president of the defendant company, though the former did not disclose whom he represented. There was a general discussion of the fairness and legality of the whole plan, but no offer of settlement seems to have been made by either party. Moreover, between February 23rd, 1935, when the charter amendment became effective, and the receipt of Hodge's letter of March 5th, 1935, 13,900 shares of the new $6.00 preferred stock of Wilson & Co., and 129,500 shares of its common stock, having a market value in all in excess

of $1,000,000 had changed hands on the New York Stock Exchange; 98,002 shares of the old preferred stock and 167,025 shares of Class A stock had also been exchanged pursuant to the plan during that period. These exchanges constituted 43.14% of the 7% preferred stock and 53.33% of the defendant's Class A stock. Moreover, in April of 1937, the defendant marketed a new issue of debentures, which were convertible into common stock. They were listed on the New York Stock Exchange, and between February 19th, 1937, the date on which the Supreme Court denied a motion for a rehearing in *Keller v. Wilson & Co., Inc.*, and the institution of this suit, $513,000 of these debentures had been traded in on that exchange. Some time during the month of April, 1937, Penick, who had then become an officer of Bay Newfoundland Company, conferred with the vice-president of Wilson & Co., with whom Hodge had previously talked. The recapitalization plan was again explained in detail, and an attempt was made to convince Penick that the persons whom he represented should exchange their Class A Stock pursuant thereto. Bay Newfoundland's interest was not disclosed at that time, and, as a matter of fact, was not known to Wilson & Co., until January 19th, 1938, when it filed a petition for leave to intervene in *Dunn v. Wilson & Co., Inc.*, pending in the United States' Court for the District of Delaware. There were other conferences between Penick and the same representative of Wilson & Co., in May, July and September of 1937. At the later conference, Penick stated that he and Hodge represented the same interest, but he did not give the name of the dissenting stockholder. On June 14th, 1937, Wilson & Co., wrote an officer of the complainant company offering to settle the controversy between them by paying the accrued and unpaid dividends due February 23rd, 1935, on each share of its Class A stock ($21.25), provided the complainant company would agree to have its stock certificates stamped to the effect that they had no

further preferences over the common stock. That offer was rejected, but the complainant replied that it would accept in settlement a payment of $21.25 per share, with interest from February 23rd, 1935, provided the stock certificates were merely stamped to the effect that all accrued and unpaid dividends had been paid to that date. Bay Newfoundland Company also sent its stock certificates to Wilson & Co., to be stamped in accordance with their offer, but it was rejected, and the certificates were returned by the defendant. The complainant's counter offer of June, 1937, not only involved the payment of accrued and unpaid dividends on its Class A stock in Wilson & Co., but also sought to have that company recognize the validity of that stock in its financial setup, though its corporate charter no longer provided for that class of stock. On September 22nd, 1937, Penick apparently wrote Wilson & Co., that the complainant company was willing to accept $90.00 per share for the cancellation of its 1700 shares of Class A stock. On September 24th, 1937, there was a further conference between Hodge and the same vice-president of the defendant company, with whom he had previously negotiated. The recapitalization plan was again discussed in some detail. *Keller v. Wilson & Co., Inc.*, 21 *Del. Ch.* 391, 190 *A.* 115, had been decided by the Supreme Court on November 10th, 1936, and a motion for a reargument had been denied on February 19th, 1937, or more than seven months prior to that conference. The effect of that decision on the rights of non-assenting stockholders of the defendant company was likewise discussed, but no settlement was reached. On September 24th, 1937, and apparently after the conference on that date, a representative of Wilson & Co. wrote to a representative of Bay Newfoundland Company:

"Perhaps the next time I am in New York I will have more time than I had on this trip and we might go into the matter at a little more length with Mr. Penick in the hope that there would be a possibility of working out a price for the A stock that would be satisfactory to both parties."

In the same letter the statement was made that Mr. Penick's claim, that the A stock had a value of around $90.00 per share, could not be taken seriously. No further conferences or correspondence took place between the parties prior to the filing of the bill, approximately five months later.

Wilson & Co. employed the Guaranty Trust Company of New York and the First National Bank of Chicago to attend to the details of exchanging the stock certificates necessitated by the plan, and incurred expenses in connection therewith amounting to $18,500. The change in the financial setup of the corporation also necessitated the printing of both new permanent certificates and script certificates for each class of stock provided for by the amendment, the cost of which was $9,470.00. There was also an additional expense of $22,800 for listing the new stock on the New York Stock Exchange. Wilson & Co., was committed to the payment of all of these expenses prior to the receipt of Hodge's letter of March 5th, 1935.

The bill in *Keller v. Wilson & Co., Inc.,* was filed in this court on March 13th, 1935; and the bill in *Saperstein v. Wilson & Co., Inc.,* was filed in the same court on April 13th of that year. Suit was instituted in *Dunn v. Wilson & Co., Inc.,* in the United States District Court for the District of Delaware in April of 1935, and is still pending. All of these cases attacked the legality of the defendant's recapitalization plan. A decree, dismissing the bill in *Saperstein v. Wilson* was entered January 22nd, 1936, and the time for appeal expired on July 22nd of the same year. It has already been pointed out that *Keller v. Wilson & Co., Inc.,* was finally disposed of on February 19th, 1937, and that the opinion of the Supreme Court, reversing the court below, had been filed on November 10th of the preceding year. 21 *Del. Ch.* 391, 190 *A.* 115. On January 13th, 1938, the complainant asked leave to intervene in *Dunn v. Wilson & Co., Inc.,* pending in the District Court, but that application was opposed, and apparently refused.

On February 23rd, 1935, there was a considerable undistributed corporate surplus, a substantial portion of which was fairly applicable to the payment of the accrued and unpaid dividends on the defendant's old Class A stock issue. In the absence of some inequitable and controlling circumstances, it must be conceded, therefore, that Bay Newfoundland Company has the right to object to such dividends being capitalized and the right to demand that they be paid in cash before any further dividends are paid on the common stock of that company. *Keller v. Wilson & Co., Inc.,* 21 *Del. Ch.* 391, 190 *A.* 115 ; *Shanik v. White Sewing Machine Corp.,* 25 *Del. Ch.* 371, 19 *A.* 2d 831. The apparent rights of Bay Newfoundland Company are based on the corporate charter of Wilson & Co., and on the preferential rights given thereby to the holders of the Class A stock of the latter company, and are therefore, of a contractual nature. But the important question is whether the complainant has lost those rights by such unreasonable delay in filing its bill, as to constitute laches. The amendment became effective on February 23rd, 1935, while the bill was not filed until February 19th, 1938, or nearly three years thereafter. The complainant claims that a delay not exceeding three years, does not affect its admitted rights. See *Bay Newfoundland Co. v. Wilson & Co., Inc.,* 24 Del. Ch. 30, 4 A. 2d 668. But the facts proved present a very different question from that raised by the admitted facts when the case was before this court on demurrer to the complainant's bill.

Whatever the complainant's apparent rights may be, when the aid of a court of equity is sought, its action is governed "by considerations of conscience, good faith and reasonable diligence" under the circumstances. *Federal United Corp. v. Havender,* 24 *Del. Ch.* 318, 11 *A.* 2d 331.

Unfair and prejudicial delay in bringing an action is not ordinarily permitted in that court. *Bay Newfoundland Co. v. Wilson & Co., Inc.,* 24 Del. Ch. 30, 4 A. 2d 668. Whether relief will be granted depends on the equities of the case,

as shown by the proven facts (*Bay Newfoundland Co. v. Wilson & Co., Inc., supra; Frank v. Wilson & Co., Inc.,* 24 Del. Ch. 237, 9 *A.* 2*d* 82) ; but no more than fair dealing by the complainant is required. 4 *Pomeroy's Eq. Jur.,* 1 *Eq. Rem.* (2*d Ed.*) 3423. Delay in filing a bill after notice of the violation of rights, is seldom fatal to the complainant's case, unless clearly prejudicial to the rights of others; at least that is true in most cases, if the suit is brought within the analogous statutory period of limitations, governing actions at law. *Bay. Newfoundland Co. v. Wilson & Co., Inc., supra; Frank v. Wilson & Co., Inc., supra.*

In *Federal United Corporation v. Havender, supra,* the Supreme Court said:

"Change of position on the part of those affected by non action, and the intervention of rights are factors of supreme importance. The promptness of action demanded of a stockholder objecting to the accomplishment of a proposed corporate act which, although unauthorized, is capable of ratification, is dependent in a large degree upon the effect of his delay on others; and where many persons will be affected by an act that involves a change of capital structure and a material alteration of rights attached to stock ownership, the stockholder, having knowledge of the contemplated action, owes a duty both to the corporation and to the stockholders to act with the promptness demanded by the particular circumstances."

See also *Romer v. Porcelain Products Corp.,* 23 Del. Ch. 52, 2 *A.* 2*d* 75.

Applying these principles to the facts, it is difficult to escape the conclusion that the complainant's claim, though valid in the first instance, is barred by laches. See *Federal United Corp. v. Havender, supra; Shanik v. White Sewing Machine Co.,* 25 *Del. Ch.* 371, 19 *A.* 2*d* 831. Many changes, materially affecting both the rights of Wilson & Co., and of third persons, had taken place prior to February 19th, 1938.. Thousands of shares of stock had been exchanged, pursuant to the plan prior to that date, and thousands of shares, having a tremendous market value, had been sold and purchased on the New York Stock Exchange. The

names of more than 11,000 persons appeared on the books of the defendant company, as shareholders, on February 19th, 1938, whose names did not appear on its records on February 23rd, 1935. All of these changes should have been foreseen by the complainant. Moreover, on April 1st, 1937, or approximately five months after the Supreme Court had handed down the opinion in *Keller v. Wilson & Co., Inc.*, the defendant company marketed a new issue of debentures which was convertible into common stock. These securities were listed on the New York Stock Exchange, and between February 19th, 1937, when the Supreme Court denied the motion for a rehearing in *Keller v. Wilson & Co., Inc.*, and the institution of this suit, they had been traded in on that exchange to the extent of $513,000.

If it were necessary, other facts might be emphasized. Continued corporate action over the known objection of a stockholder is not alone involved.

Under the facts proved, the pending suits, involving the same questions, and the complainant's continued negotiations with the defendant from about March 5th, 1935, to September 24th, 1937, cannot wholly excuse the complainant's delay. Conceding that a known pending suit, involving the same questions, may sometimes excuse a reasonable delay by a complainant in filing a subsequent bill (4 *Pomeroy's Eq. Jur.*, 1 *Eq. Rem.* (*2d Ed.*) § 1455; 30 *C. J. S., Equity*, § 125, *pp.* 548, 549), that principle cannot be invoked here. All prior pending suits, with the exception of *Dunn v. Wilson & Co., Inc.*, had been disposed of months before the complainant filed its bill; and that case had been pending since April of 1935. Independent of any other questions, too many intervening rights are involved to excuse the complainant's delay. Other facts were proved, and other contentions were made by the defendant in defense of the complainant's action, but it is unnecessary to consider them. Nor is it necessary to consider the complainant's

claim that the recapitalization plan of February 19th, 1935, was unfair to Class A stockholders.

The complainant's bill is dismissed, and a decree will be entered accordingly.